IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

v.

SHANNON MONET STEEL,

Defendant.

Case No. 26-cv-13440
Hon. Susan K. DeClercq

Emergency *Ex Parte* Motion for Temporary Restraining Order Pursuant to 18 U.S.C. § 1345

Affidavit of FBI SA Killian with Exhibits 1-4

Fed. R. Civ. Pro. 65(b)(1)(B) Certification of AUSA Welkener

**Filed Under Seal**

## EMERGENCY *EX PARTE* MOTION OF THE UNITED STATES FOR A TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE

Defendant Shannon Steel has defrauded numerous victims out of at least $1.05 million. *Verified Complaint for Injunctive Relief*, ECF 1. She appears to be actively spending victim funds to pay her credit cards and rent. Plaintiff United States of America, by and through its undersigned counsel, moves for a restraining order under 18 U.S.C. § 1345 and the Court's equitable authority, freezing the assets of Defendant Steel by preventing any person from transferring or disposing of the funds that she obtained from fraud and money laundering, or Steel's

property of equivalent value, up to a total value of at least $1.05 million. This includes the assets of the corporate entities and bank accounts that Steel controls and is using as nominees, alter egos, and vehicles for movement of criminal proceeds.

Pursuant to applicable case law, the proposed injunction contains exceptions upon application to the Court, for (1) necessary and reasonable living expenses, (2) necessary and reasonable expenses of any ongoing, legitimate business operations, and (3) use of any untainted funds that are necessary and reasonable to pay Steel's counsel of choice in her criminal case.

The Government also asks the Court to order Defendant and her companies to show cause why the Court should not enter a preliminary or permanent injunction extending this relief.

To prevent Defendant from accomplishing additional asset dissipation while this Motion is pending, to the irreparable harm of her victims, this Motion is filed *ex parte*. *See* Rule 65(b)(1) Certification of K. Craig Welkener, attached. The Government also asks the Court for permission to promptly serve this Order on financial institutions and other appropriate entities and then upon Defendant herself, including by alternative means as detailed in the proposed order.

The reasons for these requests are set forth in the underlying Verified Complaint, an Affidavit of FBI Special Agent Killian and supporting Exhibits, the attached Brief, and Rule 65(b)(1)(B) Certification of AUSA K. Craig Welkener, as well as in the related criminal action, Case No. 26-mj-30532.

Respectfully submitted,

JEROME F. GORGON JR.
United States Attorney

*/s/ K. Craig Welkener*

K. Craig Welkener (P89399)
Assistant United States Attorney
211 W. Fort St., Ste. 2001
Detroit, MI 48226
(313) 226-0248
Kenton.welkener@usdoj.gov

Date: September 9, 2026

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

v.

SHANNON MONET STEEL,

Defendant.

Case No. 26-cv-13440
Hon. Susan K. DeClercq

**Filed Under Seal**

# BRIEF IN SUPPORT OF EMERGENCY *EX PARTE* MOTION FOR A TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE

## Table of Contents

Table of Contents ..... 5
Issue Presented ..... 5
Controlling Authorities ..... 5
I. Introduction ..... 7
II. Statement of Facts ..... 7
III. Legal Standard ..... 8
IV. Discussion ..... 10
A. Steel Committed Predicate Crimes ..... 11
B. Steel is Actively Dissipating Criminal Proceeds ..... 15
C. The Proposed Order is Proper in Scope ..... 16
D. The Proposed Order Adopts the Proper Procedure ..... 23
E. Other Courts Have Granted Similar Relief ..... 23
V. Conclusion ..... 25

## Issue Presented

*Whether the Court should enter the accompanying temporary restraining order, freezing Defendant's assets up to $1.05 million for 14 days, and ordering Steel and her companies to show cause why a preliminary or permanent injunction should not be entered granting the same relief.*

## Controlling Authorities

*Statutes*

18 U.S.C. § 1345

28 U.S.C. § 1651

*Cases*

*United States v. Brown*, 988 F.2d 658, 663 (6th Cir. 1993)

*Luis v. United States*, 136 S.Ct. 1083, 1088 (2015)

## I. Introduction

As alleged by criminal complaint and the underlying civil complaint, Steel has defrauded numerous investors. She is now using victim assets to pay her credit card and rent—funds that could otherwise be forfeited and used for restitution. Unless emergency relief is granted, Defendant will be able to freely alienate and transfer the proceeds of her criminal offenses, with each transfer potentially making restitution and forfeiture that much more impossible. For the victims of these offenses, and pursuant to 18 U.S.C. § 1345, the Government asks the Court to immediately grant the requested Temporary Restraining Order (TRO).

## II. Statement of Facts

The factual allegations in the Verified Complaint are incorporated by reference as though fully stated herein. Those allegations are supplemented via the attached Declaration, along with the exhibits thereto, demonstrating the ongoing dissipation of assets.

These allegations are only a relevant summary of what Steel is known to be doing to hide and spend criminal proceeds. Her actual efforts are almost certainly more substantial, and ongoing investigation will supplement the facts presented today. The United States thus reserves the right to ask for additional relief.

## III. Legal Standard

This civil action for injunctive relief is governed by the Anti-Fraud Injunction Statute, 18 U.S.C. § 1345. The statute reads, in relevant part:

> (a)(1) If a person is—
>
> (A) violating or about to violate this chapter or section 287, 371 (insofar as such violation involves a conspiracy to defraud the United States or any agency thereof), or 1001 of this title; [or]
>
> (B) committing or about to commit a banking law violation (as defined in section 3322(d) of this title);
>
> …
>
> the Attorney General may commence a civil action in any Federal court to enjoin such violation.
>
> (2) **If a person is alienating or disposing of property, or intends to alienate or dispose of property, obtained as a result of a banking law violation** (as defined in section 3322(d) of this title) … or property which is traceable to such violation, the Attorney General may commence a civil action in any Federal court—
>
> (A) to enjoin such alienation or disposition of property; or
>
> (B) for a restraining order to—
>
> (i) prohibit any person from withdrawing, transferring, removing, dissipating, or disposing of any such property or property of equivalent value; and
>
> (ii) appoint a temporary receiver to administer such restraining order.
>
> (3)A permanent or temporary injunction or restraining order shall be granted without bond.
>
> (b) **The court** shall proceed as soon as practicable to the hearing and determination of such an action, and **may, at any time before final determination, enter such a restraining order or prohibition, or take such other action, as is warranted to prevent a continuing and substantial injury** to the United States or to any person or

> class of persons for whose protection the action is brought. A proceeding under this section is governed by the Federal Rules of Civil Procedure, except that, if an indictment has been returned against the respondent, discovery is governed by the Federal Rules of Criminal Procedure.

18 U.S.C. § 1345 (emphasis added).

"The United States bears the burden of proof of establishing that fraud has been committed, and the extent of that fraud, under section 1345." *United States v. Brown*, 988 F.2d 658, 663 (6th Cir. 1993).

In the typical case involving a request for a TRO or preliminary injunction, courts consider four factors: "(1) whether the movant has a strong likelihood of success on the merits, (2) whether the movant would suffer irreparable injury absent a stay, (3) whether granting the stay would cause substantial harm to others, and (4) whether the public interest would be served by granting the stay." *Ne. Ohio Coal. for the Homeless v. Blackwell*, 467 F.3d 999, 1009 (6th Cir. 2006); *Stein v. Thomas*, 672 F. App'x 565, 569 (6th Cir. 2016).

However, most courts hold that the traditional factors do not apply when the Government is seeking an injunction pursuant to a federal statute that was enacted to protect the public, and authorized injunctive relief. *E.g. United States v. Brown*, 988 F.2d 658, 660-64 (6th Cir. 1993) (considering an injunction under Section 1345 by referencing the statutory language and legislative history, not by weighing—as the district court did—the four factors); *United States v. American*

*Therapeutic Corporation*, 797 F.Supp.2d 1289, 1291 (S.D. Fla. 2011); *United States v. Sriram*, 147 F.Supp.2d 914, 935-37 (N.D. Ill.) ("Although the question is a close one, the Court agrees with the prevailing weight of authority that to prove an entitlement to a preliminary injunction under Section 1345, the Government need not prove all of the elements traditionally required by Rule 65."); *See also Burlington Northern Ry. Co. v. Blair*, 957 F.2d 599, 601-02 (8th Cir. 1992) ("[i]t is well established that where Congress expressly provides for injunctive relief to prevent violations of a statute, a plaintiff does not need to demonstrate harm to secure an injunction.")

Regardless of whether the Court analyzes the statute alone, or considers the four traditional factors, a temporary restraining order should be entered. All statutory factors are satisfied, the Government has shown a high likelihood of success on the merits, irreparable injury is ongoing, no substantial harm to others is likely, and the public interest would be served by freezing the Defendant's assets.

## IV. Discussion

This case satisfies all requirements for immediate injunctive relief. Pursuant to 18 U.S.C. § 1345, this Court has the power to remedy the ongoing dissipation of Steel's assets gained, in whole or in part, from her fraudulent scheme, and "property of equivalent value." 18 U.S.C. § 1345(a)(2)(B)(i).

The Court should therefore enter a TRO and Order to Show Cause (1)

prohibiting any person from transferring or disposing of Defendant's assets (to include the assets of her corporate entities) up to a total value of at least $1.05 million dollars—the amount of victim funds outstanding—and requiring Defendant and her companies to show cause, if there be any, why the Court should not enter a preliminary injunction extending this relief pending a final adjudication on the merits.

As detailed below in Discussion sections A-E, (A) Steel committed the predicate crimes, (B) she is actively dissipating criminal proceeds, (C) the proposed order is proper in scope, (D) the proposed order adopts the proper procedures for temporary and potential preliminary relief, and (E) other courts have ordered similar relief. Though organized based on the statutory requirements, this brief addresses throughout how the underlying facts satisfy the traditional factors for issuing a TRO, particularly in Sections A-C.

**A. Steel Committed Predicate Crimes**

The first predicate for injunctive relief under Section 1345 is a qualifying criminal offense. Here, Steel's scheme has violated three predicate statutes: 18 U.S.C. §§ 1343 (Wire Fraud), 1956 (Concealment Money Laundering), and 1957 (Transactions Exceeding $10,000 in Criminally Derived Property), with total proceeds of these offenses amounting to at least $1,500,000 dollars. *See* 18 U.S.C. § 1345(a)(1), (a)(2), and (b). Since Steel has repaid some money to lull victims

into a false sense of security, these lulling payment have reduced total outstanding known actual losses to $1,050,100.

As described in the Complaint, Steel routinely deceives victims into sending her hundreds of thousands of dollars during loan processes by portraying herself as the owner of a bank with significant assets, an Ambassador, and a successful hotel owner, with representations that are either materially false or grossly misleading. Steel uses corporate entities and attorney IOLTA (interest on lawyer trust account) accounts to obscure her control of the funds. She then uses the victim's funds—routed through attorney accounts—to pay her own personal expenses, and occasionally to repay victims who become too suspicious. Compl. ¶ 18-51. Thus, Steel executed a scheme to obtain money from her victims based upon false and fraudulent representations in violation of 18 U.S.C. § 1343. She also committed money laundering by knowingly using the proceeds of her fraud in transactions designed to conceal the nature, location, source, ownership, and control of those proceeds, in violation of 18 U.S.C. § 1956, and involving property of a value greater than $10,000 derived from fraud, in violation of 18 U.S.C. § 1957.

The Complaint, sworn criminal complaint, and evidence attached to this Motion amply prove Steel's offenses.

**Victim 1's $200,000 Loss:** In February 2026, pursuant to documents that promised millions in available investment funds, Shannon Steel convinced Victim

1, a businessperson in California, to wire $200,000 to an escrow account in the Eastern District of Michigan in exchange for a Standby Letter of Credit (SBLC) . In exchange, Steel provided VICTIM 1 with a false "Bank Confirmation Letter" from Deutsche Bank indicating Steel Private Bank holds an account with a balance exceeding €300,000,000 euros. Deutsche Bank investigators examined the purported Bank Confirmation Letter and determined the letter to be fraudulent and the referenced bank account not to be held by Steel or any of her companies. Compl. ¶ 19-42.

**Victim 3's $250,000 Loss:** On or about November 2025, the owner of an Ohio business (Victim 3) wired $250,000 to the same PNC Bank escrow account with ESCROW AGENT 1. Victim 3 wired the funds as part of the process of obtaining a $5.4 million loan from Steel Private Bank. Victim 3 never received the loan, or his money back. *Id.* ¶ 44.

**Victim 4's $350,000 Loss**: On or about November 2025, an entrepreneur seeking to purchase and renovate commercial property in Texas (Victim 4) wired $350,000 to the same PNC Bank escrow account with ESCROW AGENT 1. Victim 4 was seeking a loan in excess of $5 million from Steel, and wired the funds as part of that process. He never received the loan and has been demanding repayment of his escrow funds without success. *Id.* ¶ 45.

**Victim 5's $350,000 Loss**: On or about November 2025, the owner of a trucking business in Texas (Victim 5) wired $350,000 to the same PNC Bank escrow account with ESCROW AGENT 1. Steel required Victim 5 to make the payment as part of the process for obtaining a $10 million loan for business expansion and commercial debt restructuring, which Victim 5 never received. Victim 5 began to demand his money back, and after Steel's attorney's convinced Victim 5 to sign a non-disclosure agreement, Victim 5 received his money back (less a $100 wire fee) in February 2026. Nevertheless, Victim 5 has suffered extensive, long-term financial harm due to the fraud. *Id*. ¶ 47.

**Victims 6 and 7's $350,000 Loss:** On or about January 2026, two business partners in Arizona (Victims 6 and 7) wired $300,000 to the same PNC Bank escrow account with ESCROW AGENT 1, and another $50,000 to an individual acting as one of Steel's agents. Victims 6 and 7 were seeking a loan from Steel in the amount of $2.5 million, but Steel required them to wire the $350,000 as escrow money for the loan process. The loan never materialized, and Victims 6 and 7 were never repaid. *Id*. ¶ 48.

**Victim 8's $50,000 Loss:** On or about February 2026, a development company in Florida (Victim 8) wired $50,000 to the same PNC Bank escrow account with ESCROW AGENT 1, as part of obtaining a $10 million line of credit from Steel's company SPB Global. Victim 8 never received the line of credit, and

eventually requested return of their funds in May 2026. In July of 2026, Victim 8 was repaid $50,000 from a Bank of America account, even though Escrow Agent 1 told Victim 8 that Victim 8's funds never left his IOLTA account at PNC Bank. In reality, Victim 8's escrow funds had left the Escrow Agent's IOLTA account within 3 days. *Id*. ¶ 49.

The United States thus has an overwhelming likelihood of success on the merits, which (in this case) would only require the Government to prove its case by a preponderance of the evidence. *United States v. Brown*, 988 F.2d 658, 663 (6th Cir. 1993).

This satisfies the first predicate for Section 1345 relief.

**B. Steel is Actively Dissipating Criminal Proceeds**

Steel is actively dissipating her victims' money, by laundering it through attorney trust accounts and using it to pay her rent and personal credit card statements.

**Rent Payments with Victim Funds**: investigators have obtained records showing that rent payments on Steel's residence in Northville Township, MI have been regularly paid by Escrow Agent 1/Attorney M.B. using the same IOLTA account funded by Victims 1-8, including as recently as August 2026. Killian Aff. ¶¶ 5-13 and Exs. 1-2.

Additionally, on February 23, 2026, a portion of Victim 1's and Victim 8's funds—which were supposed to be held in escrow—were wired to another attorney's (Escrow Agent 2/Attorney D.L.) First Horizon Bank account. On April 7, 2026, Steel's rent was paid from Escrow Agent 2's First Horizon Bank account. Killian Aff. ¶¶ 13, Exs. 1-2.

**Personal Credit Card Payments with Victim Funds**: investigators have also obtained documents showing that Steel pays her credit card expenses with victim funds as well. For example, Escrow Agent 1 wired $18,100 on November 18, 2025, to Steel's personal savings account at American Express, from the same PNC Bank account that received funds from Victims 1-8. Steel then used those funds to pay Steel's personal American Express credit cards—cards that Steel used for personal expenses. Killian Aff. ¶¶ 14-15, Exs. 1 and 3.

Thus, the Government has an overwhelming likelihood showing by a preponderance of the evidence that Steel is dissipating and has dissipated the $1.5 in fraud/money laundering proceeds. This satisfies the second predicate for Section 1345 relief and the irreparable harm factor in traditional TRO analysis.

### C. The Proposed Order is Proper in Scope

The TRO requested tracks the statutory language, and each provision thereof is grounded in the Court's legal and equitable authority. This is the key sentence in the TRO (from Section II ¶a):

> The Court hereby **PROHIBITS** any person from withdrawing, transferring, removing, dissipating, or disposing of Defendant Shannon Monet Steel's assets, funds, or other property up to a total value of $1,050,000, subject to the exceptions listed in paragraph (i) below.

Each term in this sentence is then defined, and exceptions listed that would allow Steel and/or her entities to seek relief, including for living expenses, expenses of any ongoing, legitimate business operations, and payment of attorney fees.

This tracks the Court's statutory authority "to prohibit any person from withdrawing, transferring, removing, dissipating, or disposing of any such property [obtained as a result of a banking law violation] or property of equivalent value." 18 U.S.C. § 1345(a)(2)(B); *see also* 18 U.S.C. § 1345(b) ("The court … may, at any time before final determination, enter such a restraining order or prohibition, or take such other action, as is warranted to prevent a continuing and substantial injury to the United States or to any person or class of persons for whose protection the action is brought.")

The Order is proper in scope for the following reasons.

*First*, the order restrains the correct amount of property. The Court can and should restrain not only the criminal proceeds, but "property of equivalent value." 18 U.S.C. § 1345(a)(2)(B). Steel's fraud amounted to at least $1.5 million in proceeds, and each time that she routed stolen money through attorney accounts to fund her rent or credit cards, with the intent to conceal the source, location,

ownership, or control of her criminal proceeds, she created money laundering proceeds in violation of 18 U.S.C. § 1956. Each time that she moved the fraud/laundering proceeds in a monetary transaction in excess of $10,000, she violated 18 U.S.C. § 1957, creating more laundering proceeds.

For example, Escrow Agent 1 wired $18,100 on November 18, 2025, to Steel's personal savings account at American Express, from the same PNC Bank account that received funds from Victims 1-8. Complaint ¶ 55; Killian Affidavit. Steel then used those funds to pay Steel's personal American Express credit cards—cards that Steel used for personal expenses. *Id.* The evidence that Steel is dissipating the proceeds of wire fraud and money laundering is overwhelming.

All of Defendant's assets, funds, or other property up to a total value of $1,050,000 thus constitute property obtained either as a result of banking law violations (as defined in 18 U.S.C. § 3322, including wire fraud affecting a financial institution, and money laundering) or property of equivalent value, within the meaning of 18 U.S.C. § 1345(a)(2). The Anti-Fraud Injunction Statute explicitly contemplates restraint in this amount.

Furthermore, this is a conservative estimate of Steel's criminal proceeds, because it only reflects the victim funds identified thus far—more victims may be found. In addition, the United States would—upon proof of these allegations—be entitled to distinct restitution and forfeiture money judgments in the amount of at

least $1.05 million *each*, because these are distinct remedies. *See* Compl. ¶¶ 12-15, 18 U.S.C. §§ 981 and 982; 28 U.S.C. § 2461; *United States v. Boring*, 557 F.3d 707, 714 (6th Cir. 2009) ("Restitution is remedial in nature, and its goal is to restore the victim's loss. Forfeiture, in contrast, is punitive; it seeks to disgorge any profits that the offender realized from his illegal activity.") Thus, restraining only $1.05 million is a conservative measure.

*Second*, the Order is properly limited to Steel's property, to include the assets of the Steel Entities—assets that Steel has shielded by use of corporate entities as nominees, alter egos, for fraudulent transactions, and as vehicles for the movement of criminal proceeds.

While federal law controls this action under 18 U.S.C. § 1345, state property law determines the property rights of an individual or corporation upon which federal law acts. *See e.g. Aquilino v. United States,* 363 U.S. 509, 512–513 (1960); *Drye v. United States,* 528 U.S. 49, 58, (1999); and *United States v. Craft,* 535 U.S. 274, 278, (2002). Because this Court sits in equity pursuant to 18 U.S.C. § 1345 (and the All Writs Act), it is particularly well-situated to apply equitable doctrines such as nominee theory, alter ego theory, and fraudulent transactions. *See e.g. U.S. v. Narco Freedom, Inc.*, 95 F.Supp.2d 747, 761 (S.D.N.Y 2015) ("Section 1345 affords the Court broad equitable authority."); *United States v. Weingold*, 844

F.Supp. 1560, 1573 (D.N.J. 1994) ("Section 1345 has been held to vest the federal courts with power to decree broad remedial preliminary relief");

Under Michigan law, "the fiction of a distinct corporate entity separate from the stockholders is a convenience introduced in the law to subserve the ends of justice. When this fiction is invoked to subvert justice, it is ignored by the courts". *Id*., citing *Paul v University Motor Sales Co.*, 283 Mich 587, 602; 278 NW 714 (1938). "As such, a court sitting in equity 'may look through the veil of corporate structure'—that is, pierce the corporate veil—'to avoid fraud or injustice'." *Green v. Ziegelman,* 310 Mich. App. 436, 451, 873 N.W.2d 794, 803-04 (2015) *quoting Kline v Kline*, 104 Mich App 700, 702; 305 NW2d 297 (1981). This is the right case to "look through the veil … to avoid fraud or injustice," particularly at this initial stage, and to protect victims.

Here, Defendant Steel has been using the Steel Entities to subvert justice repeatedly and habitually. As recounted in the Complaint, Steel has fooled at least eight victims with the lure of millions of dollars in loans from Steel Private Bank and related entities, before pocketing the good faith escrow funds of her victims. Compl. ¶¶ 18-61.

In sum, the totality of the circumstances demonstrates that the Government has a strong likelihood of establishing that Steel's entities are alter egos of herself, have been used as nominees and for fraudulent transfers, and that their assets either

contain fraud proceeds, and/or are her personal assets under Michigan law. At the very least, the Government has a high likelihood of demonstrating use of the Steel Entities as nominees by a preponderance of the evidence, thus justifying initial injunctive relief.

The scope of this Order thus properly restrains Steel's property, including assets owned via the Steel Entities, up to a total value of $1.05 million.

*Third,* this Order properly restrains Steel's assets held in attorney accounts. The facts as recounted in the Complaint show that Steel is directing her victims to deposit their funds as "escrow" payments in the attorney IOLTA account of Escrow Agent 1/Attorney M.B. Complaint; Killian Aff. ¶¶ 5-10. Occasionally, Attorney M.B. transfers some of these funds to Escrow Agent 2/Attorney D.L. Killian Aff. Ex. 1 (e.g. January 16, 2026 transaction showing a transfer of $299,250 from Attorney M.B. to Attorney D.L.'s law firm, and a $150,000 wire from Attorney M.B. to Attorney D.L.'s law firm). Steel then uses these funds for her personal benefit, including her rent and credit cards. Killian Aff. ¶¶ 11-15, and Exs. 2-3.

As the Court well knows, funds of third parties held in attorney IOLTA (or even non-IOLTA) accounts belong to clients or third persons. *See e.g.* MI Rule of Professional Conduct 1.15(d) ("A lawyer shall hold property of clients or third persons in connection with a representation separate from the lawyer's own

property. All client or third person funds shall be deposited in an IOLTA or non-IOLTA account."); 1.15(f)("A lawyer may deposit the lawyer's own funds in a client trust account only in an amount reasonably necessary to pay financial institution service charges or fees or to obtain a waiver of service charges or fees"). Furthermore, "When two or more persons (one of whom may be the lawyer) claim interest in the property, it shall be kept separate by the lawyer until the dispute is resolved." MI Rule of Professional Responsibility 1.15(c).

Thus, to preserve unrelated clients' funds unfrozen, the proposed TRO does not freeze the <u>entire</u> IOLTA/non-IOLTA account, but rather directs the lawyers at issue themselves not to move "any funds held in Steel-related transactions, including funds held in attorney accounts on behalf of Steel or the Steel Entities' clients or in escrow related to those transactions." Banks receiving the TRO are not directed by its terms to freeze the attorney accounts. And to the extent that any party—including third parties or Steel's attorneys—need access to frozen funds, they can file a motion.

Thus, the Court can be confident that only the proper funds are being frozen, not funds owned by unrelated clients of the attorneys that Steel is using. The TRO freezes Steel's funds, including the funds she has taken from victims using the Steel Entities – nothing more.

### D. The Proposed Order Adopts the Proper Procedure

Pursuant to Rule 65 and the Motion and Order to Seal, the United States seeks entry of this TRO *ex parte* and under seal, with the TRO to expire in 14 days. The United States will then promptly serve the Order on financial institutions and agents controlling Steel's property and entities, followed by swift service on Steel himself (including through her criminal counsel). The United States—upon service to Ms. Steel—will immediately move to unseal the entire case, except for redactions of the names of unindicted co-conspirators. The TRO itself sets a hearing for 14 days after issuance, and orders Steel and her entities to show cause, if there be any, why this Court should not enter a preliminary injunction and thereby extend the temporary order, pursuant to Rule 65 of the Federal Rules of Civil Procedure and 18 U.S.C § 1345.

This procedure tracks with the law, with due process, and adequately protects the rights of victims, the United States, Ms. Steel, and third parties.

### E. Other Courts Have Granted Similar Relief, Including in the *William Smith* Matter

The Court would have good company in entering this Order. Other courts grant similar orders, upon similar facts. *Luis v. United States*, 136 S.Ct. 1083, 1088 (2015) (finding that Section 1345 "restraint of legitimate, untainted assets needed to retain counsel of choice violates the Sixth Amendment," but not in other

circumstances); *United States v. Brown*, 988 F.2d 658, 663 (6th Cir. 1993)[1]; *United States v. William Anthony Smith*, 24-cv-11626 at ECF Nos. 5, 25 (Parker, J.) (granting an 18 U.S.C. § 1345 TRO and later a Stipulated Preliminary Injunction on similar facts—involving wire fraud and money laundering—which no entity ever challenged); *United States v. American Therapeutic Corporation*, 797 F.Supp.2d 1289, 1293 (S.D. Fla. 2011) ("it is entirely proper for the government to enjoin not just the dissipation of the Defendants' assets traceable to the fraud but

[1] Here, this case is under 18 U.S.C. § 1345(a)(2), which authorizes "equivalent value" asset freezes for banking law violations, as noted by the Supreme Court in *Luis v. United States*, 136 S.Ct. 1083, 1088 (2015); *see also United States v. DBB, Inc.*, 180 F.3d 1277, 1286 (11th Cir. 1999) (district court may freeze assets of "equivalent value" to fraud proceeds, without regard to whether the specific assets are traceable to the fraud; reversing district court determination that United States must trace any asset to be restrained to underlying fraud).

*Brown* stated that "The district court may only freeze assets that might be forfeitable to the United States in the event that fraud is established at trial" and remanded to the district court for determination of which assets were traceable to the alleged fraud. But *Brown* was a healthcare fraud case where injunctive relief was sought under 18 U.S.C. § 1345(a)(1) and (b), which does not provide for restraint of "property of equivalent value" as in 18 U.S.C. § 1345(a)(2). After *Brown* was decided, Congress added healthcare offenses to banking law violations under Section 1345(a)(2) via the Health Insurance Portability and Accountability Act (HIPAA) of 1996, thus making "property of equivalent value" and traceable proceeds both subject to restraint in such cases. *United States v. Fang*, 937 F.Supp. 1186, 1192-93 (D. Md. 1996) (discussing legislative history). Thus, *Brown*'s limitation to traceable assets does not apply in this case (and would not apply in *Brown* itself if the case were brought today under the modern version of Section 1345(a)(2)).

also any property of equivalent value”); *United States v. Sriram*, 147 F.Supp.2d 914, 947 (N.D. Ill. 2001); *see also United States v. Payment Processing Center*, LLC, 435 F.Supp.2d 462, 464 (E.D. Pa. 2006); *United States v. Fang*, 937 F.Supp. 1186, 1202 (D. Maryland 1996); *United States v. Petters et al*., Civil No. 08-5348 (ADM/JSM) (D. Minn.); *United States v. Barnes*, 912 F.Supp. 1187, 1198; *United States v. Nazzal, et al,* No. 13-mc-51028 (E.D. Mich. June 27, 2013) (Lawson, J.) (granting similar relief under the All Writs Act). As the Courts above recognize, acting swiftly to preserve victim’s access to restitution and forfeiture is the purpose of 18 U.S.C. § 1345 and the Court’s related injunctive authority.

## V. Conclusion

Based upon the foregoing, the United States requests that the Court exercise its authority under 18 U.S.C. § 1345 and the All Writs Act and enter the proposed temporary order restraining the Defendant’s assets up to a total value of $1.05 million for 14 days, with an order to show cause why this relief should not continue.

Respectfully submitted,

JEROME F. GORGON JR.
United States Attorney

*/s/ K. Craig Welkener*
K. Craig Welkener (P89399)
Assistant United States Attorney
211 W. Fort St., Ste. 2001

Detroit, MI 48226
(313) 226-0248
Kenton.welkener@usdoj.gov

Date: September 10, 2026